```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

GREAT LAKES DREDGE AND DOCK CO.  *         CIVIL ACTION
                                 *
VERSUS                           *         No. 11-0405
                                 *
JOSHUA MARTIN                    *         SECTION "B"(1)
                                 *
```

## ORDER AND REASONS

Before the Court is Plaintiff Great Lakes Dredge and Dock Company's ("Great Lakes") Motion for Partial Summary Judgment (Rec. Doc. No. 25). In response, Defendant Joshua Martin filed a Memorandum in Opposition to Motion for Partial Summary Judgment (Rec. Doc. No. 29). Accordingly, and for the reasons articulated below,

**IT IS ORDERED** that Great Lakes' Motion for Partial Summary Judgment (Rec. Doc. No. 25) is **GRANTED**, and Martin's Counterclaim (Rec. Doc. No. 17) for punitive damages is **DISMISSED WITH PREJUDICE**.[1]

Great Lakes, the owner and operator of the M/V OHIO RIVER, employed Martin as the captain of that vessel. (Rec. Doc. No. 29 at 1). Around midnight on August 3, 2010, Martin, with three passengers on board, piloted the M/V OHIO RIVER near the Chandaleur Islands off the coast of Louisiana in St. Bernard Parish. *Id.* While

---

[1] We are grateful to Michael Razeeq, a Tulane University Law School extern with our Chambers, for his diligent work on this case.

1

navigating the waters in that area, Martin allided with a section of floating dredge pipe being used by another Great Lakes vessel. *Id.* Martin claims that no lights, radar reflectors, or other noticeable markings provided warning of the dredge pipe. *Id.* He further alleges that the M/V OHIO RIVER came to a sudden stop as a result of the allision, causing him to be thrown into the vessel's steering wheel. *Id.*

Following the incident, Martin received treatment at Primary Care Medical Center of Gulfport in Mississippi. *Id.* at 2. On August 4, 2010, Martin visited Doctors' Hospital of Slidell, where he was diagnosed with a chest wall contusion, as well as a cervical and lumbar strain. *Id.* Later, on August 12, 2010, Martin commenced treatment with Dr. Ralph Katz; five days later, he began physical therapy with Wellness Works Advanced Physical Therapy. *Id.*

Over the next six months, Martin visited Dr. Katz on numerous occasions. (Rec. Doc. No. 25-1 at 2). During that period, Dr. Katz performed multiple CT scans, x-rays, and MRI scans on Martin. *Id.* He also recommended physical therapy as well as various medications, including an epidural steroid injection,[2] to treat Martin. *Id.* Following a visit on December 29, 2010, Dr. Katz noted

---

[2] An epidural steroid injection is a type of regional injection through a catheter into the epidural space, which is inside the spinal canal but separated from the spinal cord and its surrounding cerebrospinal fluid by the dura mater. *See* Spinal Healthcare, http://www.spinal-healthcare.com/patient-information.php (last visited July 19, 2012). The epidural injection may relieve pain anywhere from a week up to a year, and it may be very beneficial for patients suffering from severe back pain. *Id.*

in Martin's patient records that he would recommend placing Martin at maximum medical improvement ("MMI") after the last epidural injection.[3] (Rec. Doc. No. 25-7 at 15). However, on February 4, 2011, Dr. Katz discharged Martin, noting that he often acted in a confrontational manner and did not abide by Dr. Katz's recommendations.[4] *Id.* at 16-17. For these reasons, Dr. Katz suggested Martin find another physician. *Id.*

On February 17, 2011, Great Lakes brought an action for declaratory judgment, requesting that this Court adjudge that Martin reached MMI and no longer was entitled to maintenance and cure. (Rec. Doc. No. 25-1 at 1). Meanwhile, on March 16, 2011, Martin began treatment with Dr. John Logan, an orthopedic surgeon, who recommended that Martin undergo a series of epidural injections, in addition to physical therapy, in order to improve his medical condition and reach MMI. (Rec. Doc. No. 29 at 2-3). Martin began visiting North Institute Physical Therapy in accordance with Dr. Logan's recommendation. *Id.* at 2.

On October 4, 2011, Martin filed an Answer and Counterclaim (Rec. Doc. No. 17) against Great Lakes, on grounds of negligence

---

[3] Black's Law Dictionary defines maximum medical improvement as "[t]he point at which an injured person's condition stabilizes, and no further recovery or improvement is expected, even with additional medical intervention;" maximum cure is defined as "[t]he point at which a *seaman* who is injured or sick has stabilized, and no additional medical treatment will improve the seaman's condition." Black's Law Dictionary 1000 (8th ed. 2004) (emphasis added).

[4] Subsequently, on February 11, 2012, Dr. Katz reaffirmed his prior opinion that Martin had reached MMI as of February 4, 2011, in a letter addressed to one of Great Lakes' attorneys. (Rec. Doc. No. 25-10).

under the Jones Act; the unseaworthiness of the M/V OHIO RIVER; and insufficient payment of maintenance and cure. (Rec. Doc. No. 25-1 at 1-2). Further, he sought punitive damages for Great Lakes' "arbitrary and capricious failure to pay maintenance and cure." Id.

**A. STANDARD OF REVIEW**

Summary judgment is appropriate if the moving party shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving there is no material factual dispute. *Hopper v. Frank*, 16 F.3d 92, 96 (5th Cir. 1994). The party seeking summary judgment must support the motion by citing to materials in the record, such as "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Celotex Corp.*, 477 U.S. at 322; Fed. R. Civ. P. 56(c).

A court reviewing a motion for summary judgment must consider all of the evidence in the record without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)). Courts must draw all reasonable inferences and weigh the evidence in favor of the nonmoving party. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d. 395, 399 (5th Cir. 2008)(quoting *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 408 (5th Cir. 2002). Where the moving party has met its initial burden, the nonmoving

party must go beyond the pleadings and designate specific facts showing that a genuine issue for trial exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could return a verdict in favor of the nonmoving party. *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).

**B. PUNITIVE DAMAGES FOR FAILURE TO PAY MAINTENANCE AND CURE**

A seaman injured in the course of his employment is entitled to maintenance and cure. *Chaney v. Omega Protein, Inc.*, No. 09-7235, 2010 WL 2977385, at *3 (E.D. La. July 21, 2010). Maintenance and cure describe the seaman's right to receive food and lodging (maintenance) and necessary medical services (cure). *Badeaux v. Magnolia Fleet, LLC*, No. 10-2697, 2011 WL 765781, at *7 (E.D. La February 25, 2011). The right to maintenance and cure exists "independent of any other source of recovery for the seaman (*e.g.*, recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994). That right terminates when a doctor provides a qualified medical opinion stating that the seaman has reached maximum cure. *Id.* at 1012; *Breese v. AWI, Inc.*, 823 F.2d 100, 104-05 (5th Cir. 1987). Ultimately, the determination of whether a seaman has reached maximum medical improvement is a medical question rather than a legal one. *Nelton v. Cenac Towing Co., LLC*, No. 10-373, 2011 WL 289040, at *23 (E.D. La January 25, 2012) (citing *Breese*, 823 F.2d at 104).

Under general maritime law, a seaman may recover punitive damages "for the willful and wanton disregard of the maintenance and cure obligation." *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 424 (2009); *Morales v. Garijack, Inc.*, 829 F.2d 1355, 1358-59 (5th Cir. 1987), *abrogated on other grounds by Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir. 1995); *see also*, *Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986) ("A shipowner who arbitrarily and capriciously denies maintenance and cure . . . is liable to [the seaman] for punitive damages and attorney's fees."). Employer conduct that might warrant an award of punitive damages includes: (1) negligence during the investigation of a claim; (2) termination of benefits because a seaman retained counsel or refused a settlement offer; or (3) failure to reinstate benefits following medical diagnosis of an ailment not previously determined. *Breese*, 823 F.2d at 103 (citing *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 288-89 (5th Cir. 1985)). The willful and wanton conduct necessary to justify an award of punitive damages requires an element of bad faith. *Nelton*, 2011 WL 289040, at *22 (quoting *Harper v. Zapata Offshore Co.*, 741 F.2d 87, 90 (5th Cir. 1985)). Bad faith may be inferred from an employer's "complete failure to consult a medical source in deciding to terminate maintenance and cure payments." *Id.* at *23 (internal citations omitted).

When faced with conflicting diagnoses and prognoses of various

physicians, a jury question exists as to whether an employer arbitrarily and capriciously terminated maintenance and cure. *Gorum v. Ensco Offshore Co.*, Nos. 02-2030, 02-2031, 2002 WL 31528460, at *8 (E.D. La. November 14, 2002) (citing *Tullos*, 750 F.2d at 389). However, an employer "does not act arbitrarily and capriciously by relying on one medical opinion over another." *Smith v. Florida Marine Transporters*, No. 10-889, 2011 WL 2580625, at *3 (E.D. La June 29, 2011); *Gorum*, 2002 WL 31528460, at *8-9; *see also*, *Barclay v. Cameron Charter Boats, Inc.*, No. 09-462, 2011 WL 3468380, at *3 (W.D. La. August 8, 2011) (holding that a jury question existed where an employer followed the recommendation of its own doctor in the face of conflicting evidence without seeking a third opinion). Each case must be evaluated on its own facts. *Breese*, 823 F.2d at 103.

In the instant case, Martin's then-treating physician, Dr. Katz, opined that his patient had reached MMI as of February 4, 2011, at which point Great Lakes ceased payments for maintenance and cure. (*See* footnote 4). Martin did not begin treatment with Dr. Logan until March 16, 2011, nearly six weeks later. (Rec. Doc. No. 29 at 2). During the interim period, Martin did not receive medical treatment for his ailments. Then, Dr. Logan recommended a treatment plan similar to that which Martin completed with Dr. Katz previously (although Dr. Logan asserts the treatment is curative). *Id.* at 2-3. Nevertheless, Great Lakes began paying for Dr. Logan's

treatment on August 16, 2011, even though Dr. Logan did not diagnose Defendant with an ailment not previously determined. *Id.* at 3; *see also Breese*, 823 F.2d at 103. Considering Martin's six-week delay in seeking another treating physician; Dr. Katz's notes indicating that Martin had reached MMI; and the absence of any new diagnosis by Dr. Logan, the record does not show that Great Lakes ceased making payments for maintenance and cure in bad faith.

Furthermore, on January 26, 2012, Great Lakes hired Dr. Najeeb Thomas to perform an independent medical examination of Martin's condition. (Rec. Doc. No. 25-1 at 3). Dr. Thomas, agreeing with Dr. Katz, issued an opinion stating that Martin had reached MMI. *Id.* The conflicting medical testimony among the various physicians presents a jury question as to whether Martin is entitled to maintenance and cure and whether he has reached MMI. However, the evidence in the record does not demonstrate that Great Lakes unreasonably, much less arbitrarily and capriciously, refused to pay maintenance and cure. The bad faith required to justify an award of punitive damages is absent from this case. No reasonable jury could find otherwise on the face of the instant record.

New Orleans, Louisiana, this 3ʳᴰ day of August, 2012.

_____

UNITED STATES DISTRICT JUDGE